## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is entered into effective as of January 15, 2015 (the "Effective Date"), by and between MCQUADE BRENNAN, LLP, a District of Columbia Limited Liability Partnership ("Seller"), BRIAN MCQUADE ("Seller's Principal"), and RIBIS, JONES & MARESCA, P.A., a Maryland professional corporation ("Purchaser").

## RECITALS

Seller owns and operates an audit, tax and accounting practice (the "Practice") located at 1730 Rhode Island Avenue, N.W., Suite 800, Washington, D.C. 20036 (the "Premises"). Seller wishes to sell to Purchaser, and Purchaser wishes to purchase, the Assets of the Practice upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing Recitals (which are incorporated into and made a substantive part of this Agreement), and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     SALE AND PURCHASE OF ASSETS.

    1.1.    Transfer of Assets. Seller agrees to sell, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase, the Practice together with all of tangible and intangible assets of the Practice, including the following properties and assets owned, leased or licensed by Seller or used in the Practice (the "Assets"):

    1.1.1. All equipment, machinery, furniture, supplies, computer hardware, leasehold improvements, trade fixtures and all other tangible personal property, including, without limitation, all of the assets described on Schedule 1.1.1 ("Tangible Personal Property");

    1.1.2. All software and all software licenses used in the Practice, together with all related user documentation;

    1.1.3. All telephone and telefax numbers and telephone directory listings, including, without limitation, the telephone number (202) 296-3306 and the telefax number 202-296-0059, and all e-mail addresses, currently or previously associated with any person in the Practice;

    1.1.4. All domain names, including the domain name www.mcquadebrennan.com, and all websites and website content;

    1.1.5. All trademarks, service marks, trade names, copyrights, advertising, marketing materials, trade secrets, know-how, methodologies and processes, whether owned by Seller or subject to license, and all goodwill associated with the foregoing;

    1.1.6. All client records, client files, client lists and client databases;

1.1.7.   All records, files, correspondence, data, documents and contacting information regarding vendors, suppliers and other third parties with whom Seller does business (other than professional advisors);

1.1.8.   All unbilled work-in-progress, subject to the provisions of 2.7; and

1.1.9   All goodwill.

1.2.   Excluded Assets.  The Assets will not include the assets listed on Schedule 1.2.

1.3.   Assignment/Transfer of Lease.  Prior to the Closing Date, the parties will work together, and each use its best efforts, to obtain the written consent of the landlord of the Premises ("Landlord") to an assignment and assumption of the current lease for the Premises ("Lease") or, at Purchaser's sole option, a new lease agreement for the Premises (collectively herein referred to as the "Lease Assignment").  Any Lease Assignment will provide that Purchaser assumes the obligations of Seller under the Lease to the extent such obligations accrue after the Closing Date, are not required to be performed prior to the Closing Date, are not the result of any default or unperformed obligation of Seller, and are disclosed on the face of the Lease.  Purchaser shall be responsible for payment of all rent due under the Lease after the Closing Date. Notwithstanding the foregoing, should the transactions hereunder constitute an event of default under the Lease, and should the Landlord take action or note a default thereunder, Purchaser shall have the right to immediately move the Practice and remove all Assets from the Premises and Purchaser not be liable for any damages or future liability, rent or otherwise, under the terms of the Lease.

1.4.   Assumed Contracts.   Seller shall furnish Purchaser with true and correct copies of each contract, agreement and lease in connection with the Practice to which Seller is a party or by which any of the Assets are subject, including any and all equipment leases and all maintenance, security, service and vendor contracts, but excluding agreements with employees, attorneys, accountants, insurers and lenders of Seller (collectively, the "Contracts").  Purchaser shall assume the contracts listed in Schedule 1.4 (the "Assumed Contracts").  Seller and Purchaser will execute and deliver to each other at Closing an Assignment and Assumption Agreement for each Assumed Contract (the "Contract Assignment"), which provides that Purchaser only assumes the obligations of Seller under the Assumed Contracts to the extent such obligations accrue after the Closing Date, are not required to be performed prior to the Closing Date, are not the result of any default or unperformed obligation of Seller, and are disclosed on the face of the Assumed Contracts.

1.5.   Excluded Liabilities.  Except for the Assumed Contracts as provided in 1.4 (the "Assumed Contracts"), Purchaser will not assume or be responsible for any debts, obligations, duties or liabilities of Seller or the Practice, including, without limitation, accounts payable, notes payable, accrued expenses, equipment leases, outstanding checks, tax liabilities, operating expenses, tort claims, judgments, or liabilities relating to Seller's employees, employee compensation, employee benefit plans and employee claims (collectively, the "Excluded Liabilities").  Seller shall remain solely responsible for and will promptly pay when due all

Excluded Liabilities. Purchaser will not be required to assume any equipment leases, it being agreed that Seller will pay the balance of any such equipment leases at or prior to Closing and will convey all Tangible Personal Property free and clear of any such lease. Purchaser has no obligation to hire any of Seller's employees.

1.6.   Bill of Sale. Seller will execute and deliver to Purchaser, at Closing, a Bill of Sale transferring all of the Assets to Purchaser (the "Bill of Sale"), together with any other instrument of transfer or assignment which Purchaser believes is reasonably necessary to transfer the Assets to Purchaser.

1.7.   Risk of Loss. The risk of loss of or destruction to any of the Assets or the Premises, in whole or in part, occurring by any cause whatever, shall remain with Seller until the Closing.

2.   PURCHASE PRICE.

2.1.   Amount and Payment Terms. The purchase price for the Assets and for the restrictive covenants set forth in Section 9 will be $2,600,000.00, subject to adjustment pursuant to the provisions of Section 2.2 (the "Purchase Price"), payable as follows:

2.1.1. The sum of $1,400,000.00 will be paid by Purchaser to Seller at Closing in cash, by wired funds or other immediately available funds acceptable to Seller.

2.1.2.   The sum of $1,200,000.00, interest free, will be paid to Seller in Eighty-Four (84) equal monthly installments of principal in the amount of $14,285.78 each, such payments commencing on the first (1st) day of the fourth (4th) month following Closing and successive monthly installments being due and payable on the same day of each month thereafter, subject to set off by reason of any adjustment to the Purchase Price pursuant to the provisions of Section 2.2, in accordance with the terms of Purchaser's Promissory Note in form attached hereto as Schedule 2.1.2 (the "Promissory Note"), which Purchaser will execute and deliver to Seller at the Closing. The Promissory Note shall be subordinate to any bank loan Purchaser procures for payment of any portion of the Purchase Price hereunder.

2.2.   Purchase Price Adjustment.

2.2.1.   Definitions. For purposes of this Agreement, the following terms will have the meanings set forth below:

"First Year Revenue" means gross fee revenue earned by Purchaser from Practice Clients during the twelve (12) month period immediately following the Closing Date, as determined on the accrual method of accounting, less discounts, write-offs, refunds and credits.

"Second Year Revenue" means gross fee revenue earned by Purchaser from Practice Clients during the twelve (12) month period beginning twelve (12) months after the

Closing Date, as determined on the accrual method of accounting, less discounts, write-offs, refunds and credits.

"Practice Client" means any person or entity that was a client of the Practice as of the Closing Date. Practice Client also includes billings in the first 12 months from new clients that came to the firm for services primarily as a result of efforts of the Seller, or from the previous practice. A Practice Client does not include any person or entity that was a client of Purchaser or any of Purchaser's affiliates as of the Closing Date or at any time during the 24 month period preceding the Closing Date.

2.2.2. <u>Revenue Adjustment</u>. The parties agree that the Purchase Price has been determined based on the assumption that Purchaser will generate at least $2,340,000.00 in First Year Revenue and $1,560,000.00 in Second Year Revenue. Accordingly, the parties agree that, if First Year Revenue is less than $2,340,000.00, the Purchase Price will be reduced by the amount by which First Year Revenue is less than $2,340,000.00. If Second Year Revenue is less than $1,560,000.00, the Purchase Price will be reduced by the amount by which Second Year Revenue is less than $1,560,000.00. There will be no adjustment to the Purchase Price if First Year Revenue or Second Year Revenue are greater than the assumptions. Within Sixty (60) days after the first anniversary of the Closing Date and the second anniversary of the Closing Date, Purchaser will deliver to Seller an accounting of First Year Revenue or Second Year Revenue, whichever is applicable, certified as accurate and complete by Purchaser. Within Thirty (30) days after delivery of such accounting to Seller, Seller will pay to Purchaser the amount, if any, by which the Purchase Price is reduced pursuant to this Section 2.2. Purchaser, at its sole option, may also offset such amount against any payment due under the Note. If Seller, within thirty (30) days of receipt of an accounting questions any such accounting, in writing, Purchaser will provide Seller with such supporting documentation that Seller may request. At a mutually agreeable time, Seller may review Purchaser's books and records relating to First Year Revenue or Second Year Revenue, within sixty (60) days after receipt of the accounting provided hereunder, provided that Seller agrees to maintain the confidentiality of all such information.

2.3. <u>Allocation of Purchase Price</u>. The Purchase Price will be allocated among the Assets as provided below:

| **Asset** | **Allocated Amount** |
|---|---|
| Tangible Personal Property | $   100,000 |
| Goodwill | $ 2,425,000 |
| Covenant not to compete (Section 9) | $    75,000 |

As soon as practicable after Closing, Seller and Purchaser will execute and deliver to each other IRS Form 8594 (Allocation of Purchase Price), reflecting this Purchase Price allocation. Unless required to do so in accordance with a "determination" as defined in Section 1313(a)(1) of the Code, neither party will take a position in any tax return, tax proceeding, tax audit or otherwise which is inconsistent with such allocation.

2.4.   <u>Closing Adjustments</u>. After the Closing Date, the total Purchase Price will be appropriately adjusted as of the Closing Date such that the following amounts will be credited to Seller: (i) an amount for any personal property taxes that Seller has paid with respect to the tangible Assets which are allocable to the period after the Closing Date; (ii) an amount for any rent paid pursuant to the Lease which is allocable to the period after the Closing Date; and (iii) an amount for any payments or deposits under any equipment lease that Purchaser elects to assume that Seller has paid which are properly allocable to the period after the Closing Date; and (iv) the amount of any deposit held by Landlord under the Lease of the office premises.

2.5.   <u>Sales, Use and Transfer Taxes</u>. Any sales, use and/or transfer taxes incurred in connection with the sale, assignment, transfer and delivery of the Assets, will be borne by Seller, and the amount thereof will be paid or escrowed at Closing.

2.6.   <u>Closing Expenses</u>.  Each party will pay fees and costs charged by such party's respective attorneys and advisors and all other costs incurred or to be incurred by such party in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated hereby.

2.7.   <u>Work in Progress</u>.  Purchaser shall make a payment to Seller for all time worked on behalf of a Practice Client, but unbilled prior to the Closing Date as set forth in Schedule 2.7 ("Work In Progress"). Purchaser shall calculate all Seller fees due hereunder for any Work in Progress by calculating the proportionate share of time worked by Seller verses total time billed to a Practice Client. Purchaser shall not be obligated to make payment hereunder, nor shall Seller be entitled to any payments, for any Work In Progress until such time as Purchaser, in its sole and absolute discretion, bills and collects full payment from the Practice Client.

3.   <u>CLOSING</u>.

The closing for the consummation of the transactions hereunder (the "Closing") will take place at 10:00 a.m. on January 15, 2015, at the offices of the Business & Technology Law Group, 6310 Hillside Court, Suite 160, Columbia, Maryland 21046, or at such other time and place as may be mutually agreed upon in writing between Purchaser and Seller. Alternatively, the Closing may be consummated by the delivery of all Closing documents and payment of funds in escrow through legal counsel for the parties, in which event all such documents and payments will be deemed to be held in escrow pending completion of the Closing. The actual time and date on which Closing is consummated is referred to as the "Closing Date."

4.   <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>.  Seller represents, warrants and covenants to Purchaser as of the Effective Date and as of the Closing Date that:

4.1.   <u>Good Standing and Authorization</u>.  Seller is a limited liability partnership duly organized, validly existing and in good standing under the laws of the District of Columbia. The execution, delivery and performance by Seller of this Agreement and all of the agreements, instruments and documents contemplated herein (the "Related Documents") are within its corporate power and have been duly authorized by all necessary corporate action. Seller has the full right, power and authority to own, lease and operate its properties and assets.

4.2.  No Violation.  The execution and delivery of this Agreement and the Related Documents and the consummation of the transactions on the part of Seller contemplated hereby and thereby do not and will not violate any agreement, license, permit, approval, consent, franchise, lease, contract, or other instrument, document or agreement to which Seller is a party or by which any of its assets are bound.

4.3.  No Consents.  Except for the consent of the Landlord, no approval or consent of, or notice to or filing with, any person not a party to this Agreement is necessary to authorize the execution or delivery of this Agreement or the Related Documents or the consummation of the transaction contemplated herein or therein by Seller.

4.4.  Compliance with Laws; Authorizations.  Seller has at all times owned, managed and conducted the Practice and used and maintained the Assets in compliance with all applicable laws, rules and regulations of all governmental authorities. Seller has all authorizations, approvals, licenses and permits of and from all governmental or quasi-governmental authorities necessary to carry on the Practice as it is currently being conducted and proposed to be conducted, to own or hold under lease or license the Assets and to perform all of the obligations it has under the Lease and the Contracts to which it is a party.  Seller has not received notice of violation of any ordinances, statutes, laws or regulations with respect to the operation of the Practice or the use or occupancy of the Premises.

4.5.  Litigation.  There is no litigation, action, suit, proceeding, claim, arbitration, inquiry or investigation, pending or threatened, by any person against or relating to Seller, Seller's Principal, any of the Assets or the Practice, or which challenges the execution, delivery or consummation of this Agreement or any of the Related Documents, or otherwise asserting any right or claim with respect to any of the Assets.  There are no judgments or liens against Seller or any of the Assets.  No bankruptcy, receivership or debtor relief proceedings are threatened or pending against Seller.

4.6.  Tangible Personal Property.  All equipment, machinery, furniture, trade fixtures and other Tangible Personal Property owned by Seller or used by Seller in the Practice are identified in Schedule 1.1.1.  Those items of Tangible Personal Property that are subject to equipment leases are identified as such on Schedule 1.1.1.

4.7.  Income Tax Returns and Financial Statements.  Seller has previously delivered to Purchaser true and complete copies of the income tax returns of Seller (collectively, the "Tax Returns"): (i) 2011, 2012, and 2013 Tax Returns and (ii) an interim Quickbooks financial statements January 1, 2014 to December 31, 2014 (iii) and accounts receivable listing as of the end of December 2014.  The Tax Returns, Financial Statements, and accounts receivable listing provided to the buyer was accurate in all material respects.

4.8.  Accounts Receivable.  Seller's accounts receivable, as shown on the Financial Statements and on Seller's other books and records as of the Effective Date and as of the Closing Date (the "Accounts Receivable"), arose out of transactions in the ordinary course of business and represent

valid rights to receive payments for bona fide services rendered and are not subject to discounts, rebates or off-sets of any kind.

4.9.    Taxes.  Seller has delivered to Purchaser complete and correct copies of the income tax returns of Seller for Seller's 2011 through 2013 tax years as filed by Seller with the Internal Revenue Service ("Tax Returns").  Seller is not a party to, and is not aware of, any pending or threatened action, suit, proceeding, or assessment against it for the collection of any federal, state or local taxes.  Seller has duly filed on or before the applicable due date (including any extensions) all Tax Returns required to be filed by it.  All Tax Returns are true, correct and complete in all material respects and were prepared in conformity with all applicable laws, rules and regulations.  Seller has duly paid or withheld, or will pay or withhold, all taxes that have become or will become due pursuant to such Tax Returns.

4.10.   Absence of Undisclosed Liabilities.  Except as set forth on Schedule 4.10, Seller has no obligation or liability (whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and whether or not insured), except liabilities reflected on Seller's interim balance sheet as of December 31, 2014.

4.11.   Absence of Changes. Except for transactions contemplated by this Agreement and except as disclosed on Schedule 4.11, since December 31, 2014, the date of Seller's interim balance sheet, Seller has not: (i) incurred any indebtedness, obligation, duty or liability (contingent or otherwise), except normal trade or business obligations incurred in the ordinary course of Seller's business; (ii) sold, transferred, pledged, encumbered or otherwise disposed of any of the Assets; (iii) cancelled or compromised any of the Contracts, accounts receivable or any other debts owed to Seller; (iv) suffered any material adverse change in Seller's operations, earnings, assets, liabilities, or business (financial or otherwise); or (v) encouraged or solicited any client of the Practice to patronize any other auditing or accounting firm or otherwise diverted business from the Practice.  Neither Seller nor Seller's Principal has any knowledge of any past, present or future condition, state of facts or circumstances which has affected or which might affect adversely the Practice or prevent Purchaser from carrying on the Practice after Closing.

4.12.   Title, Condition and Nature of Assets.  Seller owns good and marketable title to the Assets, free and clear of all liens and encumbrances, except for validly licensed software or leased property in which Seller holds a valid leasehold interest property (and identified as such on Schedule 1.1.1).  Seller leases, licenses or owns all of the properties and assets used in the Practice.

4.13.   Contracts.  Seller is not in default, nor, to the knowledge of Seller has any event occurred which with the giving of notice or the passage of time or both would constitute a default, under any Contract, and, to the knowledge of Seller no event has occurred which with the giving of notice or the passage of time or both would constitute a default by any other party to any Contract. Each of the Contracts is in full force and effect, is valid and enforceable in accordance with its terms and is not subject to any claims, charges, set-offs or defenses.

4.14.   Lease.  The Lease, a true and complete copy of which has been delivered to Purchaser (including all amendments thereto), contains the entire agreement between Seller and Landlord as to the Premises.  The Lease is in full force and effect as of the Effective Date, there

are no modifications or amendments to the Lease or any other agreements altering, modifying or supplementing the terms of the Lease, all conditions of the Lease to be performed by Seller and necessary to the enforcement of the Lease have been satisfied, Seller has paid all rent and has paid and performed all other obligations and duties required to be paid or performed by Seller under the Lease, and there are no existing defenses or offsets which the Landlord has against the enforcement of the Lease by Seller. Except for the Landlord, no other party (including but not limited to, Landlord's mortgagee if any), is required to consent to the assignment of the Lease to Purchaser as provided herein. The Premises are not subject to any sublease, assignment, license, concession or other type of occupancy agreement. All utilities and accessories, including heating, ventilating and air-conditioning, mechanical, electrical, fire extinguishing, alarm and other systems, on the Premises are in good operating order and repair, subject to reasonable wear and tear. The Lease constitutes all the real property owned or leased by Seller or Seller's Principal in connection with the Practice.

4.15.  <u>Employment Matters</u>.  Seller has paid (and will pay through Closing) all wages, bonuses, commissions and other benefits and sums due (and all required taxes, insurance, social security and withholding thereon), including all accrued vacation, accrued sick leave, accrued benefits and accrued payments (and pro rata accruals for a portion of a year) to its employees. Seller has maintained in effect (and will maintain in effect through Closing) all insurance policies and other employee benefits covering any employee claims incurred through the Effective Date of this Agreement.   Attached hereto as Schedule 4.15 is a list of all current employees of Seller.

4.16.  <u>Insurance</u>.  Seller has delivered to Purchaser a copy of each insurance policy maintained with respect to the Practice and/or the Assets. Seller will maintain such insurance at least through the Closing. All of such policies are in full force and effect on a claims made basis with no premium arrearage. Seller has given in a timely manner to its insurers all notices required to be given under its insurance policies with respect to all of the claims and actions covered by insurance, and no insurer has denied coverage of any such claims or actions or reserved its rights in respect of or rejected any of such claims. Seller has not received any notice or other communication from any such insurance company canceling or materially amending any of such insurance policies, and no such cancellation or amendment is threatened. There are no pending claims asserting liability of Seller under any insurance policy.

4.17.  <u>Intellectual Property</u>.  To the knowledge of Seller, no claim by any third party contesting the validity, enforceability, use or ownership of any copyrights, trademarks or other intellectual property has been made or threatened. Seller has not received any notices of, an allegation of, any infringement or misappropriation by, or conflict with, any third party with respect to such intellectual property rights, nor has Seller received any claims of infringement or misappropriation of or other conflict with any intellectual property of any third party.

4.18.  <u>Brokers and Finders</u>.  Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage fees, finder's fees, agent's commissions, or the like in connection with this Agreement or the transactions contemplated hereby.

4.19.   Full Disclosure.  This Agreement, including all exhibits and Schedules hereto, does not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein and herein, in light of the circumstances under which they were made, not misleading.  There is no fact known to Seller which is not disclosed in this Agreement which materially adversely affects the accuracy of the representations and warranties contained in this Agreement.

4.20.   Effective Date of Warranties; Survival.  Each warranty, representation and covenant of Seller set forth in this Section 4 will be deemed to be made on and as of the Effective Date of this Agreement and again on and as of Closing Date (except as otherwise specifically provided) and shall survive the Closing.  Seller and Seller's Principal shall execute and deliver to Purchaser at Closing a Certificate whereby Seller and Seller's Principal certify all of the representations and warranties of Seller are true and correct in all material respects as of the Closing Date.

4.21.   Income Tax Returns and Financial Statements.  Any tax returns or financial statements of Seller provided to the Purchaser  were accurate in all material respects.

4.22.   Full Disclosure.  There is no fact known to Seller which is not disclosed in this Agreement which materially adversely affects the accuracy of the representations and warranties of Seller contained in this Agreement.

5.   REPRESENTATIONS AND WARRANTIES BY PURCHASER.  Purchaser represents, warrants and covenants to Seller as of the Effective Date and as of the Closing Date that:

5.1.   Good Standing and Authorization. Purchaser is a professional corporation duly organized, validly existing and in good standing under the laws of the State of Maryland.  The execution, delivery and performance by Purchaser of this Agreement and the Related Documents are within its corporate power and have been duly authorized by all necessary corporate action.  Purchaser has the full right, power and authority to own, lease and operate its properties and assets.

5.2.   No Violation.  The execution and delivery of this Agreement and the Related Documents and the consummation of the transactions on the part of Purchaser contemplated hereby and thereby do not and will not violate any agreement, license, permit, approval, consent, franchise, lease, contract, or other instrument, document or agreement to which Seller is a party or by which any of its assets are bound.

5.3.   No Consents.  Except for the consent of the Landlord, no approval or consent of, or notice to or filing with, any person not a party to this Agreement is necessary to authorize the execution or delivery of this Agreement or the Related Documents or the consummation of the transaction contemplated herein or therein by Purchaser.

5.4.   Litigation. There is no litigation, action, suit, proceeding, claim, arbitration, inquiry or investigation, pending or threatened, by any person against or relating to Purchaser which challenges the execution, delivery or consummation of this Agreement or any of the Related

Documents or any of the transactions contemplated herein.  No bankruptcy, receivership or debtor relief proceedings are threatened or pending against Purchaser.

5.5.    Brokers and Finders.  Purchaser has not incurred any obligation or liability, contingent or otherwise, for brokerage fees, finder's fees, agent's commissions, or the like in connection with this Agreement or the transactions contemplated hereby.

5.6.    Effective Date of Warranties; Survival.  Each warranty, representation and covenant of Purchaser set forth in this Agreement will be deemed to be made on and as of the Effective Date of this Agreement and again on and as of Closing Date (except as otherwise specifically provided) and will survive the Closing.

6.      CONDITIONS TO CLOSING.

6.1.    Conditions Benefiting Purchaser.  Purchaser's obligation hereunder to complete Closing will be conditioned upon the satisfaction (or Purchaser's written waiver) of each of the following conditions precedent: (i) each of Seller's representations and warranties in this Agreement will be true and accurate as of the Closing Date as if they were made as of the Closing; (ii) Seller will have substantially performed all agreements, obligations, deliveries and conditions required by this Agreement to be performed by Seller at or prior to Closing; (iii) the Premises will be in full compliance with all applicable laws, regulations, rules, ordinances and codes (including subdivision, zoning and building codes) of all governmental authorities and with all private covenants and will have passed all inspections necessary to maintain Seller's existing Practice operations, to the extent Purchaser requests such inspections prior to Closing; (iv) assignment or assumption of the Lease; (v) Seller and Seller's Principal will each execute and deliver to Purchaser a certificate certifying that all the representations and warranties of Seller and of Seller's Principal contained in this Agreement are true and correct in all material respects as of the Closing Date.

6.2.    Conditions Benefiting Seller.  Seller's obligation hereunder to complete Closing will be conditioned on the satisfaction (or Seller's written waiver) of each of the following conditions precedent: (i) each of Purchaser's representations and warranties in this Agreement will be true and accurate as of the Closing Date as if they were made as of the Closing; (ii) Purchaser will have substantially performed all agreements, obligations, deliveries and conditions required by this Agreement to be performed by Purchaser at or prior to Closing; and (iii) Purchaser will execute and deliver to Seller a certificate certifying that all the representations and warranties of Purchaser contained in this Agreement are true and correct in all material respects as of the Closing Date.

7.      PRE-CLOSING COVENANTS.

7.1.    Certain Pre-Closing Covenants.  Seller will at Seller's expenses prior to the Closing Date (i) continue to operate and manage the Practice and the Assets in the ordinary and usual manner, (ii) maintain the Assets in the manner in which they are presently maintained and in its present condition, ordinary wear and tear excepted, (iii) maintain in full force and effect all property, general liability, professional liability and all other insurance policies in the same amounts and coverages now maintained by Seller; (iv) perform in all material respects all of its

current obligations under all Contracts; and (v) maintain the Practice's books of account and records in the usual and regular manner consistent with prior periods; (vi) not permit any liens, security interests or other encumbrances to be placed against the Assets; (vii) not sell, transfer or otherwise dispose of any of the Assets or remove any of the Assets from the Premises, unless replaced with comparable assets of equal value in the ordinary course.

7.2.    Confidentiality.  Subject to any requirement of law or judicial process, prior to Closing, or if this Agreement is terminated for any reason, neither party shall disclose any financial information, confidential information, or trade secret received by it from any other party pursuant to the terms of this Agreement, and each party shall continue to hold such information in confidence; provided, however, that each party shall be entitled to disclose such information to its lender, attorneys, tax advisors and other professional advisors and consultants in connection with this transaction and who are notified in writing of this confidentiality provision.  The provisions of this Section shall not apply to information of either party which has become available to the public through no breach of this Agreement or other wrongful act by the other party.

7.3.    Negotiations with Other Parties.  Until the Closing, Seller and Seller's Principal jointly and severally agree that they will not (i) solicit or entertain offers from third parties for the purchase of all or any portion of the Assets or the Practice or any securities of Seller, or (ii) otherwise initiate, encourage the initiation by others, or participate in any discussion or negotiations with any other person relating to the sale of all or any portion of the Assets or the Practice or any securities of Seller.

8.    POST-CLOSING TRANSITION.

8.1.    Transition Assistance.  Seller and Seller's Principal will after Closing cooperate with and assist Purchaser in achieving an orderly transition of the Practice and the Assets to Purchaser and in maintaining goodwill with clients, vendors, referral sources and other business associates.  For a period of two (2) months after Closing, Seller's Principal will at Purchaser's request continue to work at the Premises on a full-time basis at no additional charge, providing transition cooperation and assistance, performing accounting services for clients and consulting with Purchaser in the management of the Practice.  Thereafter, for one (1) year after the Closing Date, Seller's Principal will be available by telephone and email to respond to inquiries from Purchaser.  Other than the consideration of payment of the Purchase Price as set forth herein, Seller's Principal will not receive any compensation for the foregoing services.

8.2.    Public Announcements.  The parties will send a mutually acceptable announcement of this acquisition to clients, vendors and referral sources of the Practice within thirty (30) days after the Closing Date.  To the extent practicable, the acquisition will be described as a merger of the Practice with Purchaser's existing auditing, tax and accounting practice.  Unless Purchaser otherwise consents in writing or as may be required by law or rules of professional conduct, no public announcement will be made of the retirement of Seller's Principal for at least twelve (12) months after the Closing Date.  Any such announcement to clients, vendors or referral sources of the Practice will be subject to prior written approval by Purchaser.  Seller and Seller's Principal authorize Purchaser's use of, and license to Purchaser by way of this Agreement, a perpetual, world-wide, fully pre-paid, exclusive, and assignable license to, use the names of Seller

and Seller's Principal in any form or manner it sees fit, including in the name of the Practice, the business or the Purchaser, or any successor or assign.

9.    RESTRICTIVE COVENANTS.

9.1.    Seller and Seller's Principal jointly and severally agree that, for a period of Five (5) years after the Closing Date, they shall not, directly or indirectly, either for their own benefit or for the benefit or on behalf of any other person:

(i)    provide or solicit to provide any auditing, tax preparation, tax advisory or accounting services to any person or entity that was a client of the Practice as of the Closing Date or at any time during the twenty four (24) month period immediately preceding the Closing Date;

(ii)    encourage or solicit any person or entity that was a client of the Practice as of the Closing Date or at any time during the twenty four (24) month period immediately preceding the Closing Date to obtain auditing, tax preparation, tax advisory or accounting services from any firm other than Purchaser or Purchaser's affiliates;

(iii)    disparage Purchaser, any affiliate of Purchaser or any employee of Purchaser to Purchaser's clients, vendors, suppliers, employees or other business associates; or

(iv)    employ or offer employment to any employee of Purchaser or otherwise induce or attempt to induce any employee of Purchaser to terminate his or her employment with Purchaser.

9.2.    If for any reason any of the provisions of this Section 9 is held to be unenforceable by reason of extent, duration, geographic scope or otherwise, then the court or tribunal making such determination shall reduce such extent, duration, geographic scope or other provision, and in its reduced form, such provision shall be enforceable.

9.3.    Seller and Seller's Principal acknowledge that the foregoing restrictions are an integral part of the Purchase Price and are reasonably required to protect Purchaser's practice and purchase hereunder and do not place an unreasonable hardship on Seller or Seller's Principal. In the event of a breach of the covenants set forth in Section 9.1, Purchaser will be entitled to institute and prosecute proceedings at law and in equity to obtain damages arising from such breach and to enjoin Seller and Seller's Principal from violating such obligations, including by temporary and/or permanent injunction.

9.4.    Columbia Financial Advisors, LLP ("the Firm"), is a District of Columbia limited liability partnership in which Seller's Principal is its Managing Partner and majority owner.  The Firm is an investment advisory firm and is operated from Seller's offices at 1730 Rhode Island Ave. NW Suite 800 Washington DC  20036, which is its registered office.  Seller has no ownership interest in the Firm and the Firm is listed as an Excluded Asset on Schedule 1.2 merely for emphasis.    Seller's Principal intends to continue to operate the Firm post-Closing.  Certain clients of the Firm are also clients of Seller.  Seller's Principal agrees to operate

the Firm within the limitations set forth in this Section 9 and Seller's Principal shall not violate the restrictive covenants in this Section.  The furnishing of account statements and income reports by the Firm to its clients shall not be considered to be tax preparation, tax advisory or accounting services in violation of the restrictive covenants set forth in this Section 9.

10.   INDEMNIFICATION.

10.1.   Indemnification of Purchaser.  Seller and Seller's Principal jointly and severally agree to indemnify, hold harmless and defend Purchaser, its, officers, stockholders, successors and assigns (collectively, the "Purchaser Indemnified Parties") from and against all liabilities, demands, claims, actions, causes of action, losses, costs, damages and expenses, including, without limitation, reasonable attorneys' fees, which any Purchaser Indemnified Party may suffer or incur relating to or by virtue of: (i) any action, demand, proceeding or claim by any person (including any governmental authority and including tax obligations) relating to the ownership, operation or possession of the Practice, the Assets or the Premises prior to the Closing Date; (ii) any breach by Seller or Seller's Principal of any of their covenants, agreement, representation or warranty hereunder; and (iii) the Excluded Liabilities.

10.2.   Indemnification of Seller.  Purchaser hereby agrees to indemnify, hold harmless and defend each of Seller and Seller's Principal and their respective heirs, personal representatives, successors and assigns (collectively, the "Seller Indemnified Parties") from and against all liabilities, demands, claims, actions, causes of action, losses, costs, damages and expenses, including, without limitation, reasonable attorneys' fees, which any Seller Indemnified Party may suffer or incur relating to or by virtue of: (i) any action, demand, proceeding or claim by any person (including any governmental authority and including Tax obligations) relating to the ownership, operation or possession of the Practice, the Assets or the Premises (except as set forth in Section 1.3) after the Closing Date (other than the Excluded Liabilities); and (ii) any breach by Purchaser of any its covenants, agreement, representation or warranty hereunder.

11.   MISCELLANEOUS.

11.1.   Notices.  Any notice, demand or other communication to be given hereunder (each of which is referred to herein as a "Notice") shall be in writing and given by (i) hand delivery, (ii) express overnight delivery service or (iiii) certified or registered mail, return receipt requested, and shall be deemed to have been delivered upon (a) receipt, if hand delivered, (b) the next business day, if delivered by express overnight delivery service, or (d) the third business day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested.  Notices shall be provided to the following addresses, or to any other address which the recipient notifies the other party of by giving Notice of in the manner set forth herein:

If to Purchaser:
10500 Little Patuxent Parkway, Suite 770
Columbia, Maryland 21044
Attn. David A. Jones

With a copy to:
Business & Technology Law Group
6310 Hillside Court, Suite 160
Columbia, Maryland 21046
Attn. Christopher S. Young, Esq.

If to Seller or Seller's Principal:
1730 Rhode Island Ave, N.W., Suite 800
Washington, D.C. 20036

With a copy to:
Brian P. Murphy, Esq.
Griffin Murphy Moldenhauer & Wiggins LLP
1912 Sunderland Pl NW
Washington DC  30036

Any time period shall commence on the day such Notice is deemed given and received.  For purposes of this Agreement, the term "business day" shall include all days other than Saturdays, Sundays and federal banking holidays.

11.2.   Assignment.  No party hereunder will assign or delegate any of its rights or obligations hereunder without the prior written consent of the other party.

11.3.   Binding Effect.  The terms and conditions of this Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, successors, and permitted assigns.

11.4.   Entire Agreement.  This Agreement constitutes the entire agreement between the parties and there are no representations, warranties or commitments except as set forth herein.  This Agreement supersedes all prior and contemporaneous agreements, letters of intent, understandings, negotiations and discussions, written or oral, of the parties hereto, relating to the transactions contemplated by this Agreement.  This Agreement may be amended only in writing executed by the parties hereto affected by such amendment.  No reliance upon or waiver of one or more provisions of this Agreement will constitute a waiver of any other provisions hereof.

11.5.   Counterparts.  This Agreement may be executed in counterparts, in which event each such counterpart will be deemed to be an original, but all of which counterparts together will constitute one and the same instrument.

11.6.   Schedules.  Except as expressly set forth in this Agreement, each fact or statement recited or contained in any Schedule will be deemed a representation and warranty hereunder.  Each Schedule referred to herein as being attached to this Agreement is incorporated into this Agreement by reference and made a part hereof.

NAAB145

11.7.   Tax Consequences.  There will be no recourse by any party hereto against any other party hereto by reason of the fact that the execution of consummation of this Agreement or of any transaction contemplated hereby has or does not have any particular tax consequences.

11.8.   Construction.  The words "hereof", "herein", "hereunder", "hereto", and other words of similar import refer to this Agreement in its entirety.  The word "person" includes a natural person, an estate, trust, corporation, partnership, limited liability company, or other legal entity.  The term "affiliate" means with respect to any person, any person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such person.  The enumeration and headings of the sections of this Agreement are merely for convenience of reference and do not constitute representations or warranties, do not impose any obligations whatever, and have no substantive significance.  Unless the context otherwise requires, whenever used in this Agreement the singular will include the plural, the plural will include the singular, and the masculine gender will include the neuter or feminine gender and vice versa.  This Agreement will be construed without the aid of any canon, custom or rule of law requiring construction against the draftsman, and this Agreement will be construed reasonably to carry out its intent without presumption against or in favor of either party.

11.9.   Governing Law; Jurisdiction. This Agreement will be governed by and construed and enforced in accordance with the laws of the State of Maryland.  All suits, proceedings and other actions relating to, arising out of or in connection with this Agreement will be brought in the federal and state courts in the State of Maryland.  Each party hereby consents to the *in personam* jurisdiction of such courts, agrees that venue will properly lie in each such courts, and hereby waives any claim against or objection to *in personam* jurisdiction of such courts and any contention that the venue of such courts is *forum non conveniens*.

11.10.   Waiver.  Resort to one form of remedy will not constitute a waiver of alternative remedies.  No delay or failure to exercise any right or remedy will operate as a waiver thereof, except where specifically provided herein to the contrary.  No acceptance by any party of partial payment of any sum due hereunder will be deemed a waiver by such party of its rights to receive the full amount due, nor will any endorsement or statement on any check or accompanying letter from a party be deemed an accord and satisfaction.

11.11.   Severability.  If any provision of this Agreement will for any reason be held invalid or unenforceable by any court of competent jurisdiction, such invalidity or unenforceability will not affect any other provision hereof.  Any provision of this Agreement that is declared invalid or unenforceable in any application will remain in full force and effect as to valid applications, and the offending provision will be deemed to be modified to the minimum extent necessary to make such provision valid and enforceable.

11.12.   No Third Party Beneficiaries.  This Agreement is made solely among and for the benefit of the parties hereto, and their successors and permitted assigns, and no other person will have any rights, interests or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

11.13.   Further Assurances.  Each party agrees to execute, acknowledge, seal and deliver, on and after the Effective Date and the Closing Date, without additional consideration, such further assurances, instruments and documents, and to take such further actions, as the other party may reasonably request in order to fulfill the intent of this Agreement and the transactions contemplated hereby.

11.14.   No Partnership or Agency Created.  Neither party will be considered as the partner, co-venturer or agent of the other party.  Neither party will have authority to incur any liabilities, debts or obligations for the other, and neither party will be liable for the debts or obligations incurred by the other, except as expressly provided herein.

11.15.   Time of the Essence.  TIME IS OF THE ESSENCE with respect to each and every provision of this Agreement; provided, however, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Maryland then, and in such event, the time of such period will be extended to the next day which is not a Saturday, Sunday or legal holiday.

11.16.   Purchaser's Right of Setoff.  Purchaser will have the right to setoff against any sums which might otherwise be due and payable to Seller under the Note or this Agreement, any amounts which are or may become due by Seller to Purchaser under this Agreement, including, without limitation, any obligation Seller may have to indemnify Purchaser hereunder and any obligation of Seller to pay Purchaser any amount by which the Purchase Price is reduced pursuant to the provisions of Section 2.2.

11.17.   Attorneys' Fees.  In the event either party brings a suit to interpret or enforce any provision of this Agreement, then the party who substantially prevails in such action, including any appeal therefrom, in addition to all other remedies provided by this Agreement, will be entitled to the costs of suit and any appeal, including reasonable attorneys' fees and court costs.

11.18.   Waiver of Jury Trial.  THE PARTIES WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR ANY OF ITS PROVISIONS.  THIS WAIVER APPLIES TO ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS AND PROCEEDINGS, INCLUDING PERSONS WHO ARE NOT PARTIES TO THIS AGREEMENT.

11.19.   Representation by Counsel.  EACH PARTY ACKNOWLEDGES THAT SUCH PARTY HAS BEEN REPRESENTED BY SUCH PARTY'S OWN LEGAL COUNSEL IN CONNECTION WITH THIS AGREEMENT.

11.20.   Effective Date.  The date on which this Agreement, having been executed by Purchaser, is executed by Seller and delivered to Purchaser, shall be inserted as the "Effective Date" of this Agreement in the first paragraph hereof, together with the knowledge a reasonable business person would have obtained after making reasonable inquiry and after exercising reasonable diligence with respect to the matters at hand.

12.   <u>PERSONAL GUARANTEES</u>.

Seller's Principal hereby jointly and severally, unconditionally and irrevocably, guarantee to Purchaser (i) the timely, complete and continuous performance and observance of all covenants, agreements and obligations of Seller contained in this Agreement and under the Related Documents, including, but not limited to, Seller's obligation to pay to Purchaser any amount by which the Purchase Price is reduced pursuant to the provisions of Section 2.2; (ii) the truth and accuracy of all representations and warranties of Seller in this Agreement and the Related Documents; and (iii) Seller's indemnification obligations under this Agreement and the Related Documents. This guaranty is one of payment and performance and not merely collection, and makes Seller's Principal the equivalent of joint and several co-obligor with Seller. The obligations of Seller's Principal shall be primary and not secondary, and Purchaser shall be under no obligation to pursue or exhaust its rights or remedies against Seller before pursuing its rights against Seller's Principal. No discharge, modification, impairment or limitation of the obligations of Seller to its creditors under any law relating to bankruptcy, insolvency or arrangements with creditors shall in any way affect or discharge the liability of Seller's Principal hereunder.

*SIGNATURES ON FOLLOWING PAGE*

EXECUTED by the parties on the dates set forth below.

SELLER:

MCQUADE AND BENNAN, LLP


By: _____ (SEAL)        Date: _____1/15/2015_____
Brian McQuade, Managing Partner


SELLER'S PRINCIPAL:


_____                    Date: _____1/15/2015_____
Brian McQuade


PURCHASER:

RIBIS, JONES & MARESCA, P.A.


By:_____ (SEAL)          Date: ____1-15-15____
    David A. Jones, President

NAAB149

Schedule 1.1.1
Tangible Personal Property

MCQUADE BRENNAN, LLP

## Tax Asset Detail   1/01/13 - 12/31/13

09/15/2014 10:37 AM
Page 1

FYE: 12/31/2013

| Asset dt | Property Description | Date In Service | Tax Cost | Sec 179 Exp Current = c | Tax Bonus Amt | Tax Prior Depreciation | Tax Current Depreciation | Tax End Depr | Tax Net Book Value | Tax Method | Tax Period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Group:** | | | | | | | | | | | |
| 149 | Mercedes | 6/12/12 | 57,500.00 | 0.00c | 11,160.00 | 11,160.00 | 5,100.00 | 16,260.00 | 41,240.00 | 200DB | 5.0 |
| | **No Group** | | 57,500.00 | 0.00c | 11,160.00 | 11,160.00 | 5,100.00 | 16,260.00 | 41,240.00 | | |
| **Group: COMPUTERS & EQUIPMENT** | | | | | | | | | | | |
| 75 | COLOR PRINTER - HP 4500 | 1/13/99 | 3,050.89 | 0.00 | 0.00 | 3,050.89 | 0.00 | 3,050.89 | 0.00 | 200DB | 5.0 |
| 84 | 3COM Autosensing Switch | 4/28/00 | 1,018.00 | 0.00 | 0.00 | 1,018.00 | 0.00 | 1,018.00 | 0.00 | 200DB | 5.0 |
| 98 | HP L4300 Printer | 12/17/03 | 2,738.94 | 2,738.94 | 0.00 | 2,738.94 | 0.00 | 2,738.94 | 0.00 | 200DB | 5.0 |
| 101 | HP LASER JET 4300 PRINTER | 2/19/04 | 2,578.47 | 2,578.47 | 0.00 | 2,578.47 | 0.00 | 2,578.47 | 0.00 | 200DB | 5.0 |
| 103 | HP PAVILION ZV5000 | 2/20/04 | 1,622.88 | 1,622.88 | 0.00 | 1,622.88 | 0.00 | 1,622.88 | 0.00 | 200DB | 5.0 |
| 104 | HP PAVILION ZD7000 | 2/20/04 | 2,193.46 | 2,193.46 | 0.00 | 2,193.46 | 0.00 | 2,193.46 | 0.00 | 200DB | 5.0 |
| 108 | 2 HP zv5000 Laptops (FH & AG) | 11/12/04 | 3,185.65 | 3,185.65 | 0.00 | 3,185.65 | 0.00 | 3,185.65 | 0.00 | 200DB | 5.0 |
| 111 | COMPUTER | 5/20/05 | 2,950.00 | 2,950.00 | 0.00 | 2,950.00 | 0.00 | 2,950.00 | 0.00 | 200DB | 5.0 |
| 113 | COMPUTER | 7/26/05 | 568.00 | 568.00 | 0.00 | 568.00 | 0.00 | 568.00 | 0.00 | 200DB | 5.0 |
| 115 | COMPUTER | 10/06/05 | 570.00 | 570.00 | 0.00 | 570.00 | 0.00 | 570.00 | 0.00 | 200DB | 5.0 |
| 116 | COMPUTER | 10/19/05 | 4,591.67 | 4,591.67 | 0.00 | 4,591.67 | 0.00 | 4,591.67 | 0.00 | 200DB | 5.0 |
| 120 | COMPUTER | 7/25/06 | 1,649.00 | 0.00 | 0.00 | 1,649.00 | 0.00 | 1,649.00 | 0.00 | 200DB | 5.0 |
| 122 | COMPUTER | 10/25/06 | 937.50 | 0.00 | 0.00 | 937.50 | 0.00 | 937.50 | 0.00 | 200DB | 5.0 |
| 123 | COMPUTER | 11/22/06 | 937.50 | 0.00 | 0.00 | 937.50 | 0.00 | 937.50 | 0.00 | 200DB | 5.0 |
| 126 | COMPUTER | 4/04/07 | 2,411.15 | 0.00 | 0.00 | 2,411.15 | 0.00 | 2,411.15 | 0.00 | 200DB | 5.0 |
| 127 | LAPTOP | 7/11/07 | 1,057.46 | 0.00 | 0.00 | 1,057.46 | 0.00 | 1,057.46 | 0.00 | 200DB | 5.0 |
| 128 | COMPUTER - BRIAN | 7/11/07 | 1,148.69 | 0.00 | 0.00 | 1,148.69 | 0.00 | 1,148.69 | 0.00 | 200DB | 5.0 |
| 129 | SCANNER | 12/31/07 | 911.30 | 0.00 | 0.00 | 911.30 | 0.00 | 911.30 | 0.00 | 200DB | 5.0 |
| 130 | COMPUTER | 1/15/09 | 501.79 | 0.00 | 250.90 | 415.08 | 57.81 | 472.89 | 28.90 | 200DB | 5.0 |
| 131 | PRINTER | 2/05/09 | 845.95 | 0.00 | 422.98 | 699.77 | 97.45 | 797.22 | 48.73 | 200DB | 5.0 |
| 135 | COMPUTER MONITOR | 10/12/09 | 343.07 | 0.00 | 171.54 | 268.97 | 49.40 | 318.37 | 24.70 | 200DB | 5.0 |
| 138 | COMPUTER MONITOR -3 | 12/10/09 | 1,139.91 | 0.00 | 569.96 | 893.69 | 164.15 | 1,057.84 | 82.07 | 200DB | 5.0 |
| 139 | PRINTER - BRIAN | 2/11/10 | 327.97 | 0.00 | 163.99 | 233.51 | 37.78 | 271.29 | 56.68 | 200DB | 5.0 |
| 141 | FAX MACHINE | 3/11/10 | 499.99 | 0.00 | 250.00 | 281.34 | 62.47 | 343.81 | 156.18 | 200DB | 5.0 |
| 143 | COMPUTER MONITOR -BDM | 4/12/10 | 242.74 | 0.00 | 121.37 | 172.83 | 27.96 | 200.79 | 41.95 | 200DB | 5.0 |
| 145 | CHAIR | 5/11/10 | 210.93 | 0.00 | 105.47 | 118.69 | 26.35 | 145.04 | 65.89 | 200DB | 5.0 |
| 147 | PRINTER | 3/16/11 | 1,129.59 | 0.00 | 1,129.59 | 1,129.59 | 0.00 | 1,129.59 | 0.00 | 200DB | 5.0 |
| 148 | PRINTER | 6/13/11 | 1,485.42 | 0.00 | 1,485.42 | 1,485.42 | 0.00 | 1,485.42 | 0.00 | 200DB | 5.0 |
| 150 | Computer Equipment | 1/01/13 | 28,675.04 | 28,675.04c | 0.00 | 0.00 | 28,675.04 | 28,675.04 | 0.00 | 200DB | 5.0 |
| | **COMPUTERS & EQUIPMENT** | | 69,522.96 | 28,675.04c | 4,671.22 | 39,819.45 | 29,198.41 | 69,017.86 | 505.10 | | |
| **Group: FURNITURE & EQUIPMENT** | | | | | | | | | | | |
| 2 | CONFERENCE TABLE | 1/01/86 | 5,652.00 | 2,618.00 | 0.00 | 5,652.00 | 0.00 | 5,652.00 | 0.00 | PRE | 5.0 |
| 4 | CREDENZA | 1/01/86 | 481.00 | 0.00 | 0.00 | 481.00 | 0.00 | 481.00 | 0.00 | PRE | 5.0 |
| 7 | FURNITURE | 11/01/87 | 4,231.00 | 0.00 | 0.00 | 4,231.00 | 0.00 | 4,231.00 | 0.00 | 200DB | 7.0 |
| 8 | DESKS & FURNISHINGS | 12/01/87 | 1,454.00 | 0.00 | 0.00 | 4,454.00 | 0.00 | 1,454.00 | 0.00 | 200DB | 7.0 |
| 13 | DESK & FURNISHINGS | 1/01/88 | 925.70 | - 925.70 | 0.00 | 925.70 | 0.00 | 925.70 | 0.00 | 200DB | 7.0 |
| 36 | FRONT AREA FURNITURE | 10/01/93 | 3,400.00 | 3,400.00 | 0.00 | 3,400.00 | 0.00 | 3,400.00 | 0.00 | 200DB | 7.0 |
| 40 | BLK CONFERENCE RM CHAIRS | 5/31/94 | 3,430.00 | 3,430.00 | 0.00 | 3,430.00 | 0.00 | 3,430.00 | 0.00 | 200DB | 7.0 |
| 56 | OAK CABINET | 11/18/98 | 325.00 | 325.00 | 0.00 | 325.00 | 0.00 | 325.00 | 0.00 | 200DB | 7.0 |
| 58 | 6 MANAGERS CHAIRS | 12/01/98 | 4,625.00 | 4,625.00 | 0.00 | 4,625.00 | 0.00 | 4,625.00 | 0.00 | 200DB | 7.0 |

NAAB151

MCQUADE BRENNAN, LLP

**Tax Asset Detail   1/01/13 - 12/31/13**

09/15/2014 10:37 AM
Page 2

FYE: 12/31/2013

| Asset # | Property Description | Date In Service | Tax Cost | Sec 179 Exp Current = c | Tax Bonus Amt | Tax Prior Depreciation | Tax Current Depreciation | Tax End Depr | Tax Net Book Value | Tax Method | Tax Period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Group: FURNITURE & EQUIPMENT (continued)** | | | | | | | | | | | |
| 60 | 4 CONSOLES | 10/20/98 | 4,388.00 | 4,388.00 | 0.00 | 4,388.00 | 0.00 | 4,388.00 | 0.00 | 200DB | 7.0 |
| 62 | CAST IRON SCALE | 10/06/98 | 1,060.00 | 1,060.00 | 0.00 | 1,060.00 | 0.00 | 1,060.00 | 0.00 | 200DB | 7.0 |
| 65 | BLACK LEATHER CHAIR | 1/06/99 | 770.92 | 770.92 | 0.00 | 760.92 | 0.00 | 770.92 | 0.00 | 200DB | 7.0 |
| 66 | RECEPTION AREA & CONFERE | 2/01/99 | 4,987.62 | 4,987.62 | 0.00 | 4,987.62 | 0.00 | 4,987.62 | 0.00 | 200DB | 7.0 |
| 67 | FULLER BLDG PRINT | 2/05/99 | 793.13 | 0.00 | 0.00 | 722.88 | 46.83 | 769.71 | 23.42 | 150DB | 15.0 |
| 68 | SAKS & MACYS PRINTS | 2/05/99 | 793.12 | 0.00 | 0.00 | 722.87 | 46.83 | 769.70 | 23.42 | 150DB | 15.0 |
| 70 | RAY ON QUARRY PRINT | 1/18/99 | 1,612.69 | 0.00 | 0.00 | 1,469.85 | 95.23 | 1,565.08 | 47.61 | 150DB | 15.0 |
| 71 | BLACK MESA PRINT | 1/18/99 | 1,612.69 | 0.00 | 0.00 | 1,469.85 | 95.23 | 1,565.08 | 47.61 | 150DB | 15.0 |
| 78 | MAHOGANY DESK/BOOK SHEL | 7/09/99 | 1,534.80 | 1,534.80 | 0.00 | 1,534.80 | 0.00 | 1,534.80 | 0.00 | 200DB | 7.0 |
| 96 | SHREDDER | 12/18/02 | 862.54 | 862.54 | 0.00 | 862.54 | 0.00 | 862.54 | 0.00 | 200DB | 7.0 |
| 99 | Desk, Return and Book Shelf (Maha | 1/22/04 | 1,381.88 | 1,381.88 | 0.00 | 1,381.88 | 0.00 | 1,381.88 | 0.00 | 200DB | 7.0 |
| 100 | Paper Folder | 2/19/04 | 625.36 | 625.36 | 0.00 | 625.36 | 0.00 | 625.36 | 0.00 | 200DB | 7.0 |
| 102 | SHELVES/LATERAL FILE (LLC | 2/19/04 | 767.73 | 767.73 | 0.00 | 767.73 | 0.00 | 767.73 | 0.00 | 200DB | 7.0 |
| 105 | MEETING ROOM CHAIRS | 3/24/04 | 988.98 | 988.98 | 0.00 | 988.98 | 0.00 | 988.98 | 0.00 | 200DB | 7.0 |
| 112 | FILE CABINET | 7/25/05 | 807.00 | 807.00 | 0.00 | 807.00 | 0.00 | 807.00 | 0.00 | 200DB | 7.0 |
| 117 | FILE CABINET | 8/09/05 | 229.98 | 229.98 | 0.00 | 229.98 | 0.00 | 229.98 | 0.00 | 150DB | 15.0 |
| 118 | FURNITURE | 9/13/05 | 1,875.41 | 0.00 | 0.00 | 1,791.72 | 83.69 | 1,875.41 | 0.00 | 200DB | 7.0 |
| 119 | FURNITURE | 3/22/06 | 1,162.50 | 0.00 | 0.00 | 1,110.62 | 51.88 | 1,162.50 | 0.00 | 200DB | 7.0 |
| 121 | FURNITURE | 4/27/06 | 781.99 | 0.00 | 0.00 | 747.09 | 34.90 | 781.99 | 0.00 | 200DB | 7.0 |
| 124 | KITCHEN TABLE | 8/15/06 | 563.65 | 0.00 | 0.00 | 488.19 | 50.31 | 538.50 | 25.15 | 200DB | 7.0 |
| 125 | FLAT SCREEN TELEVISION | 1/22/07 | 7,490.03 | 0.00 | 0.00 | 6,487.32 | 668.47 | 7,155.79 | 334.24 | 200DB | 7.0 |
| 133 | CONFERENCE ROOM PHONE | 2/06/07 | 655.44 | 0.00 | 327.72 | 450.70 | 58.50 | 509.20 | 146.24 | 200DB | 7.0 |
| 134 | TELEPHONE - JOE | 8/04/09 | 199.99 | 0.00 | 100.00 | 127.10 | 20.83 | 147.93 | 52.06 | 200DB | 7.0 |
| 136 | TELEPHONE - BRIAN E. | 11/06/09 | 188.99 | 0.00 | 94.50 | 120.12 | 19.68 | 139.80 | 49.19 | 200DB | 7.0 |
| 137 | LOBBY CHAIRS | 12/23/09 | 2,928.33 | 0.00 | 1,464.17 | 1,861.16 | 304.91 | 2,166.07 | 762.26 | 200DB | 7.0 |
| 140 | WORKSTATIONS | 2/11/10 | 9,549.18 | 0.00 | 2,201.09 | 2,201.09 | 734.81 | 2,935.90 | 6,613.28 | 150DB | 15.0 |
| 142 | FURNITURE - LOBBY CHAIRS | 3/11/10 | 2,659.93 | 0.00 | 1,329.97 | 1,496.69 | 332.35 | 1,829.04 | 830.89 | 200DB | 7.0 |
| 144 | CONF. RM. CHAIRS | 4/12/10 | 3,116.42 | 0.00 | 1,558.21 | 1,755.56 | 389.39 | 2,142.95 | 973.47 | 200DB | 7.0 |
| 146 | PROJECTOR | 6/11/10 | 1,230.88 | 0.00c | 615.44 | 876.39 | 141.80 | 1,018.19 | 212.69 | 200DB | 5.0 |
| | **FURNITURE & EQUIPMENT** | | 81,539.90 | 28,675.04c | 7,691.10 | 68,222.73 | 3,175.64 | 71,398.37 | 10,141.53 | | |
| **Group: LEASEHOLD IMPROVEMENTS** | | | | | | | | | | | |
| 88 | Build-out 2 offices | 12/01/00 | 4,477.00 | 0.00 | 0.00 | 1,387.05 | 114.79 | 1,501.84 | 2,975.16 | S/L | 39.0 |
| | **LEASEHOLD IMPROVEMENTS** | | 4,477.00 | 0.00c | 0.00 | 1,387.05 | 114.79 | 1,501.84 | 2,975.16 | | |
| | **Grand Total** | | 213,039.86 | 28,675.04c | 23,522.32 | 120,589.23 | 37,588.84 | 158,178.07 | 54,861.79 | | |

NAAB152

Schedule 1.2
Excluded Assets

Four pieces of art work located in the Premises.
One vehicle - Mercedes

Schedule 4.1
Assumed Contracts


| | |
|---|---|
| Thompson Reuters | $17,211 per annum |
| Invario Consulting (IT) | $ 1,320 per month |
| Leaf (Copier Lease) | $   729 per month |
| Pitney Bowes | $   186 per quarter |
| Thompson Reuters | $ 1,650 per month (Cloud access 16 users) |
| Allied Telecom | $ 2,174 per month |
| Deer Park | $    46 per month |

Schedule 2.1.2
Promissory Note

Schedule 2.7
Work in Progress

Schedule 4.10
Undisclosed Liabilities

None.

Schedule 4.11
Changes

None.

NAAB158

Schedule 4.15
Seller's Employees

Farah Aleem
Jacqueline Clarke
Sam Habib
Brenda Hebert
Jane Howitt
Tanka Khanal
Stephanie Macdisi
Peter Marumahoko
John Mclane
Sean McQuade
Julio Molina
Nathan Felton
Emily Poon
Andrea Spetrini
Judith Stanfield
Christof Thurn
Christina Wiley-Randolph